IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MERCED CANTU,                        §
                                     §
          Plaintiff,                 §
                                     §
v.                                   §   CIVIL ACTION NO. H-09-3103
                                     §
MICHAEL J. ASTRUE,                   §
COMMISSIONER OF THE                  §
SOCIAL SECURITY ADMINISTRATION,      §
                                     §
          Defendant.                 §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Plaintiff's Cross-Motion for
Summary Judgment (Docket Entry No. 12), Defendant's Cross-Motion
for Summary Judgment (Docket Entry No. 11) and the responses filed
thereto.  The court has considered the motions, all relevant
filings, and the applicable law.  For the reasons set forth below,
Plaintiff's Cross-Motion for Summary Judgment is **DENIED** and
Defendant's Cross-Motion for Summary Judgment is **GRANTED**.

**I. Case Background**

Plaintiff Merced Cantu ("Plaintiff") filed this action
pursuant to 42 U.S.C. § 405(g) for judicial review of an
unfavorable decision by the Commissioner of the Social Security
Administration ("Commissioner") regarding Plaintiff's claim for
disability insurance and supplemental security income benefits
under Titles II and XVI of the Social Security Act ("the Act").

---

[1]     The parties consented to proceed before the undersigned magistrate
judge for all proceedings, including trial and final judgment, pursuant to 28
U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 8-10.

## A. Procedural History

Plaintiff filed for disability benefits on September 11, 2006, claiming an inability to work since June 10, 2006.[2]  After his application was denied at the initial[3] and reconsideration[4] levels, Plaintiff requested a hearing by an Administrative Law Judge of the Social Security Administration ("ALJ").[5]  The ALJ granted Plaintiff's request and conducted a hearing in Corpus Christi, Texas, on August 6, 2008.[6]  After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on September 11, 2008.[7]  The ALJ concluded that Plaintiff had no severe impairments or combination of impairments that would entitle him to disability benefits.[8]

On November 14, 2008, Plaintiff requested a review of the ALJ's decision and, on February 26, 2009, supplied additional medical records documenting that he was suffering from a number of mental impairments including depression, post-traumatic stress disorder ("PTSD") and other cognitive limitations.[9]

---

[2]   Transcript of the Administrative Proceedings ("Tr.") 52.

[3]   Tr. 53-55.

[4]   Tr. 56-57.

[5]   Tr. 76-78.

[6]   Tr.  18-50.

[7]   Tr. 10-19.

[8]   Tr. 19.

[9]   Tr. 5, 167-211.

On January 30, 2009, Plaintiff also filed a new application for benefits based on depression, PTSD and other cognitive limitations.[10]   On April 3, 2009, Plaintiff was awarded social security disability benefits based on the new application, with an onset of date of September 10, 2008.[11]   On July 24, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.[12]  Having exhausted his administrative remedies,[13] Plaintiff filed a timely civil action for judicial review of the Commissioner's unfavorable decision for the closed period of June 10, 2006, through September 9, 2008.

## 1.  Plaintiff's Medical History

### a.  Pre-Hearing Medical Records

There is one medical record that predated Plaintiff's alleged onset of disability.  On January 19, 2006, Plaintiff was seen at the Veterans Administration Medical Center in Long Beach, California for a routine medical examination.[14]  He disclosed that he was suffering from diabetes mellitus but denied any other

---

[10]   Tr. 1.

[11]   Id.; see also Tr.214.

[12]   Tr. 3-5.

[13]   See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust his administrative remedies.

[14]   Tr. 217.

medical problems at the time.[15]   The medical record noted no musculoskeletal abnormalities, no neurological abnormalities, no shortness of breath and no depression.[16]   Plaintiff was screened for PTSD but denied any symptoms of the disorder.[17]   Plaintiff was scheduled for a routine sigmoidoscopy but failed to show up for the procedure.[18]

On September 18, 2006, three months after the alleged onset of disability, Plaintiff was examined by Lemuel J. Clanton, Jr., M.D., ("Dr. Clanton") in connection with Plaintiff's claim for a service-connected disability.[19]   Dr. Clanton's report stated that Plaintiff had suffered from diabetes mellitus since 1999 but did not have a history of diabetic ketoacidosis or hypoglycemia.[20]   Plaintiff's diabetes was treated with medication and diet.[21]   Dr. Clanton noted that the diabetes had resulted in poor eyesight, fatigue, erectile dysfunction, left side pain and numbness of the hip and leg, breathing difficulties, bladder control problems and gum deterioration.[22]   Dr. Clanton found that Plaintiff's peripheral

---

[15]   Tr. 218.

[16]   Tr. 218-19.

[17]   Tr. 220.

[18]   Tr. 218.

[19]   Tr. 246-49.

[20]   Tr. 246.

[21]   Plaintiff reported taking Metaformin and Glyburide twice daily.   Id.

[22]   Id.

4

nerve examination was within normal limits and that Plaintiff had normal motor function in his upper and lower extremities but had decreased pin prick sensations in those same extremities.[23]   Dr. Clanton determined that the decreased sensation and bladder and bowel dysfunctions were complications from diabetes.[24]

Dr. Clanton found that Plaintiff did not suffer from hypertension but recommended a stress test based on an abnormal EKG test.   The follow-up treadmill stress test showed that Plaintiff had borderline ischemia and a fair exercise tolerance but no hypertensive heart disease.[25]  Plaintiff was diagnosed with coronary artery disease.[26]

On September 18, 2006, Plaintiff saw an audiologist to evaluate his claim of hearing loss.   The audiologist found a bilateral hearing loss and intermittent tinnitus.   Plaintiff could recognize ninety-two percent of the testing word list with his right ear and seventy-two percent with his left ear.[27]

On November 8, 2006, Plaintiff saw George Comer, O.D., ("Dr. Comer") complaining of transient blurred vision.[28]  Dr. Comer found

---

[23]     Tr. 247-48.

[24]     Tr. 248.

[25]     Tr. 250.

[26]     Tr. 251.   Plaintiff achieved ninety-four percent of his predicted heart rate. Id.

[27]     Tr. 258.

[28]     Tr. 261.

5

normal intraocular pressures and no evidence of diabetic retinopathy.[29]  Plaintiff's vision could be corrected to 20/20.[30]

Based on the above testing, on December 8, 2006, the Department of Veterans Affairs found a sixty-percent disability for Plaintiff's coronary artery disease secondary to the service-connected disability of diabetes mellitus with dystrophic nails and transient refractive change in both eyes.[31]  The Department of Veterans Affairs further found a ten percent disability for bilateral hearing loss, a ten percent disability for tinnitus, a twenty percent disability based on diabetes mellitus, a ten percent disability for peripheral neuropathy in the right leg, a ten percent disability for peripheral neuropathy in the left leg, a ten percent disability for peripheral neuropathy in the right arm, a ten percent disability for peripheral neuropathy in the left arm and no disability based on hypertension.[32]  The Veterans Administration denied Plaintiff's claim for Individual Unemployability benefits on the ground that Plaintiff had failed to submit evidence of an employment history.[33]

Plaintiff requested reconsideration of this decision and, on

---

[29]   Id.

[30]   Id.

[31]   Tr. 265.

[32]   Tr. 263-64.

[33]   Tr. 271.

6

January 16, 2007, was granted benefits for ninety-percent service-connected disabilities.[34]

The only other medical records presented to the ALJ documented several visits by Plaintiff to the Veterans Administration outpatient clinic in Corpus Christi between February 2007 and June 2008.[35] Those visits are summarized below.

On February 6, 2007, Plaintiff visited the clinic for a routine checkup. He was diagnosed with uncontrolled diabetes.[36] A PH-Q2 screen was administered for depression and Plaintiff denied all symptoms of depression.[37]

On June 12, 2007, Plaintiff returned to the clinic for a routine checkup.[38] He complained of periodontitis and numbness in his left lower leg.[39] Plaintiff was advised that he may have to begin insulin treatment.[40] Plaintiff was screened for depression and PTSD. He denied symptoms of both.[41]

---

[34]    Tr. 273-74.

[35]    Tr. 276-77.

[36]    Tr. 314.

[37]    Tr. 316. That screening asks whether, in the past two weeks, the patient had been bothered by feeling down, depressed, or hopeless or having little interest or pleasure in doing things. Plaintiff answered, "Not at all," to each inquiry, resulting in a score of zero or negative for depression.

[38]    Tr. 308-09.

[39]    Tr. 309.

[40]    Tr. 310.

[41]    Tr. 311, 317.

7

On June 26, 2007, Plaintiff was examined at the clinic for diabetic retinopathy.[42]  No abnormalities were observed.[43]

On October 16, 2007, Plaintiff visited the clinic for a routine checkup.  He reported no sensory deficits that would interfere with his ability to feel.[44]  Plaintiff also disclosed that he walked frequently, walking outside his room at least twice a day and inside the room at least once every two hours.[45]  No mood disorders were disclosed by Plaintiff during that visit.[46]

On February 7, 2008, Plaintiff had a routine checkup at the clinic.  Plaintiff indicated that he was willing to start taking insulin for his diabetes.[47]  He also disclosed that he was having unpleasant dreams but did not wish to share the particulars.[48]  A PTSD screening was administered and was found to be negative for PTSD.[49]  Nonetheless, Plaintiff was referred for a mental health assessment.[50]

On April 24, 2008, Plaintiff met with a social worker for a

---

[42]    Tr. 306.

[43]    Id.

[44]    Tr. 301.

[45]    Id.

[46]    Tr. 301-06.

[47]    Tr. 295.

[48]    Id.

[49]    Tr. 298.

[50]    Tr. 297.

mental health assessment.   Plaintiff disclosed that he felt depressed about his inability to work and fearful of his anger.[51] He admitted having suicidal thoughts as well as poor memory and concentration.[52]  The note reflected that Plaintiff cried throughout the interview.[53]   He was offered social work services or mental health services at the Veterans Administration Center but declined.[54]

A June 18, 2008 progress note indicated that Plaintiff was walking six miles per day, five days per week.[55]  Plaintiff reported his mood was better with exercise and activity.  A PH-Q2 screen was performed; Plaintiff's test score of zero revealed no depression.[56]

On July 8, 2008, the medical records showed that Plaintiff's blood glucose level was high and he was told to adjust his insulin.[57]

### b.  Post-Hearing Medical Records

On January 19, 2009, Plaintiff underwent a psychiatric evaluation by Jaime Ganc, M.D. ("Dr. Ganc").[58]   Dr. Ganc

---

[51]   Tr. 285-86.

[52]   Tr. 286.

[53]   Tr. 290.

[54]   Tr. 285, 290.

[55]   Tr. 281, 282.

[56]   Tr. 283.

[57]   Tr. 278.

[58]   Tr. 181-87.

administered the Beck Depressive Inventory Scale and found that
Plaintiff had a mild-to-moderate level of depression.[59]  Based on
the House-Tree-Person Drawing, Dr. Ganc found Plaintiff to be
withdrawn, confused, and somewhat disorganized in his thinking.[60]
He also deduced that Plaintiff avoided looking at his problems and
had no psychological defenses.[61]  Dr. Ganc interpreted the Sentence
Completion test to find that Plaintiff was angry, sad, withdrawn,
and frustrated, and that Plaintiff was losing his self-esteem and
his own frame of reference based on his inability to return to
work.[62]

    Dr. Ganc concluded that Plaintiff had major depressive
disorder, moderate; generalized anxiety disorder, moderate; and
post-traumatic stress disorder, chronic.[63]  Dr. Ganc opined that
Plaintiff was unable to work based on his current mental status.[64]
Dr. Ganc also stated that, based on Plaintiff's current illness, it
appeared that Plaintiff had been unable to work since June 2006.[65]

    On January 20, 2009, Plaintiff underwent a neuropsychological

---

[59]    Tr. 184.

[60]    Tr. 184.

[61]    Id.

[62]    Id.

[63]    Id.

[64]    Tr. 185.

[65]    Id.

evaluation by Larry Pollock, Ph.D. ("Dr. Pollock").[66]  Dr. Pollock
found Plaintiff to be friendly and cooperative.  Plaintiff's
comprehension of test instructions was rated "good," and his
concentration and attention span were considered "fair."[67]  Dr.
Pollock noted that Plaintiff was often distracted by his thoughts.[68]
Dr. Pollock found Plaintiff's mood to be "mostly good, but
sometimes depressed."[69]

Dr. Pollock administered a number of tests to Plaintiff.
Plaintiff was determined to have a Full Scale Intelligence Quotient
score of 95.[70]  Based on the personality assessment, Dr. Pollock
determined that Plaintiff was depressed and had PTSD.[71]  Dr. Pollock
also found that Plaintiff suffered from a cognitive disorder based
on the fact that his academic functioning in word reading, spelling
and math computation were significantly lower than his intellectual
abilities.[72]

**2.  Testimony before the ALJ**

**a.  Plaintiff's Testimony**

---

[66]     Tr. 191-201.

[67]     Tr. 192.

[68]     Id.

[69]     Id.

[70]     Tr. 195.

[71]     Tr. 197.

[72]     Tr. 196-97.

11

Plaintiff testified that he was fifty-seven years old at the time of the hearing. He served in the United States Marine Corps from 1971 to 1977 where he received his GED.[73] After he left the service, he worked in the underground construction industry, where he started as a laborer and advanced to a supervisor.[74] As the supervisor, Plaintiff was responsible for completion of the project and the safety of his crew.[75] In that position he often worked alongside his crew and frequently lifted ten pounds.[76] Plaintiff was also a certified heavy equipment operator.[77]

Plaintiff last worked in May 2006 on a full-time basis.[78] He explained that he quit his job because it was difficult for him to hold onto objects with his hands and the reduced sensation in his legs made it dangerous for him to operate heavy machinery.[79] At the time that Plaintiff left his job, he estimated that he was able to lift ten pounds occasionally and up to three pounds frequently.[80] At the hearing, Plaintiff stated that he could not pour from a

---

[73]   Tr. 25.

[74]   Tr. 26.

[75]   Id.

[76]   Tr. 27.

[77]   Id.

[78]   Tr. 27-28.

[79]   Tr. 32.

[80]   Tr. 33.

gallon of milk without his hands shaking.[81]

Plaintiff estimated that he could stand or walk continuously for an hour before needing to sit down.[82]  After an hour on his feet, his legs would start to grow numb and tingle.[83]  Plaintiff estimated that he could sit for one or two hours before having to lie down.[84]  In an eight-hour workday, Plaintiff stated that he could sit, stand or walk for only three or four hours.[85]  Plaintiff testified that his medical condition had gotten worse since he stopped working.[86]

Upon questioning by the ALJ, Plaintiff admitted that he was able to bathe and dress himself,[87] drive,[88] and walk six miles over a three-hour period.[89]

On redirect examination by his attorney, Plaintiff was asked if he was evaluated by the Veterans Administration for PTSD.[90] Plaintiff stated that he was asked about PTSD and he did not want

---

[81]    Id.

[82]    Tr. 35.

[83]    Id.

[84]    Tr. 36-37.

[85]    Tr. 37.

[86]    Tr. 38.

[87]    Tr. 39.

[88]    Tr. 40.

[89]    Id.

[90]    Tr. 42.

to talk about it.[91]  Plaintiff admitted forgetting things, such as where he left his keys.[92]  Plaintiff also agreed that he had difficulty concentrating and was no longer able to multi-task.[93]

### b.  Vocational Expert's Testimony

Jesus Duarte testified as the ALJ's vocational expert ("VE"). The VE reviewed Plaintiff's work history and classified his past work as superintendent of underground construction as light, skilled work.[94]  Plaintiff's work as a foreman and heavy equipment operator were considered medium, skilled work.[95]  Plaintiff's past employment as a construction worker was classified as heavy, semi-skilled work.[96]

Reviewing Plaintiff's past employment, the VE testified that only Plaintiff's work as a superintendent would be capable of being performed at the light exertional level and had a sit/stand option.[97]  Plaintiff's superintendent position would also produce skills that could be transferred to other light level positions.[98] Plaintiff had no past employment that could be considered

---

[91]    Tr. 42-43.

[92]    Tr. 43.

[93]    Tr. 43-44.

[94]    Tr. 46.

[95]    Tr. 46-47.

[96]    Tr. 47.

[97]    Tr. 48.

[98]    Id.

14

sedentary.   The VE testified that if the ALJ found Plaintiff's testimony about his limitations to be wholly credible, he would not be able to return to any past job.[99]

### 3.  Decision of the ALJ/Appeals Council

On September 11, 2008, the ALJ issued his decision.[100]   He found that Plaintiff had not engaged in any gainful work activity since June 10, 2006.[101]   The ALJ next determined that Plaintiff had the severe impairments of coronary artery disease, diabetes mellitus, hearing loss, and obesity.[102]   The ALJ stated that there was no evidentiary support for a claim that Plaintiff had a severe mental impairment.[103]

At step three, the ALJ found that Plaintiff did not have an impairment that met the severity threshold required by the regulations, commonly referred to as "the Listings."[104]   The ALJ found that Plaintiff's coronary artery disease did not meet Listing 4.04 for ischemic heart disease because there was no evidence in the record that any of the criteria of paragraph A or B were present or that performance of exercise testing, coupled with

---

[99]    Id.

[100]   Tr. 9-17.

[101]   Tr. 11.

[102]   Id.

[103]   Id.

[104]   See 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.1525, and 416.926).

objective medical findings showing blockages or narrowing of certain coronary arteries, would present significant risk to Plaintiff as required by paragraph C.[105]   The ALJ noted that Plaintiff achieved ninety-four percent of the target heart rate during treadmill testing and was found to have no evidence of congestive heart failure, heart heaves or thrills.[106] Acknowledging that the Veteran's Administration found that Plaintiff was sixty-percent disabled based on a diagnosis of coronary artery disease, the ALJ concluded that the Veterans Administration had overrated the severity of Plaintiff's cardiac impairment in light of the objective findings in the medical records.[107]

The ALJ found that Plaintiff's diabetes did not meet or equal Listing 9.08 because the medical evidence did not show acidosis, retinitis proliferans, end-organ damage, retinopathy, foot problems, or any related disturbance of gross and dexterous movements, gait, and station.[108]   The ALJ also considered the Veteran Administration's finding that Plaintiff was twenty-percent disabled because of the diabetes with peripheral neuropathy, but noted that although the February 2008 medical examination supported a claim of peripheral neuropathy incident to diabetes, the

---

[105]   Tr. 12.

[106]   Tr. 15

[107]   Id.

[108]   Id.

decreased sensation in Plaintiff's legs did not prevent him from maintaining a six-miles-per-day walking regimen.  A July 2008 examination showed "'no sensory deficit which would limit [Plaintiff's] ability to feel OR [sic] voice pain or discomfort.'"[109]

The ALJ also considered the Veteran Administration's determination that Plaintiff had a ten-percent disability rating based on hearing loss and tinnitus but rejected it as disabling because Plaintiff appeared to have no difficulty understanding what was said at the hearing.[110]

After considering all of Plaintiff's symptoms that were consistent with the objective medical evidence, the ALJ found that Plaintiff had the residual functional capacity ("RFC") for light work with a "sit/stand" option and with the further restriction that Plaintiff avoid greater than occasional exposure to workplace hazards.[111]  The ALJ concluded that Plaintiff was capable of performing his past relevant work as a superintendent of underground construction.[112]  In so finding, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and

---

[109]    Tr. 15 (emphasis in original).

[110]    Id.

[111]    Id.

[112]    Tr. 16.

limiting effects of his symptoms were not entirely credible.[113]

On July 24, 2009, the Appeals Council issued its decision denying Plaintiff's request for review.[114]   In the decision, the Appeals Council considered the supplemental evaluations concerning Plaintiff's mental impairments and found that the information did not provide a basis for changing the ALJ's decision for the closed period June 10, 2006, through September 9, 2008.[115]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether substantial record evidence supports the decision; and 2) whether proper legal standards were used to evaluate the evidence.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); Brown, 192 F.3d at 496.   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.   Brown, 192 F.3d at 496.   The Commissioner

---

[113]     Tr. 14.

[114]     Tr. 1-4.

[115]     Tr. 2.

18

is given the responsibility of deciding any conflicts in the evidence.  Id.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405 (g).  Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making the court's review meaningless.  Brown, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable

to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and RFC must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving he is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth. Brown, 192 F.3d at 498; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled. Greenspan, 38 F.3d at 236.

### III. Analysis

Plaintiff requests judicial review of the Commissioner's decision to deny disability benefits. Plaintiff contends that the decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures. Specifically, Plaintiff argues that: (1) the Commissioner failed to apply the proper standard in determining that Plaintiff's mental impairment was "not severe;" (2) the Commissioner failed to call a medical expert to testify about the combined effects of Plaintiff's physical and mental impairments; (3) the ALJ failed to develop the record when he failed to obtain additional medical testimony on the impact of Plaintiff's physical and mental impairments. As Plaintiff was

20

awarded disability benefits dating from September 10, 2008, forward, the court limits its inquiry to the closed period June 10, 2006, through September 9, 2008.

**A.  Severity of Plaintiff's Mental Impairment.**

The ALJ found that Plaintiff had the following severe impairments: coronary artery disease, diabetes mellitus, hearing loss and obesity.[116]  The ALJ found that Plaintiff did not have a mental impairment that was severe.[117]  Plaintiff first argues that the Commissioner failed to properly classify his mental impairment as severe and thus failed to apply the correct legal standard for non-severity.

At Step 2, the ALJ considers whether the claimant has a medically determinable impairment or combination of impairments that are severe.  20 C.F.R. § 404.1520(c).  Severity is determined by whether the impairment or combination of impairments significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1521; Social Security Ruling ("SSR") 85-28, 1985 WL 56856 (S.S.A. 1985); SSR 96-3p, 1996 WL 374181 (S.S.A. July 2, 1996); SSR 96-4p, 1996 WL 374187 (S.S.A. July 2, 1996).

In <u>Stone v. Heckler</u>, 752 F.2d 1099, 1101 (5th Cir. 1985), the court held that a mental impairment is considered non-severe only

---

[116]     Tr. 11.

[117]     <u>Id.</u>

21

if it does not cause more than a minimal limitation in the claimant's ability to perform basic mental work activities or activities of daily living.  The court stated, "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  Stone v. Heckler, 752 F.2d at 1101 (internal quotations and citations omitted).

Although the ALJ cited to Stone v. Heckler in support of his finding that Plaintiff had a non-severe mental impairment, Plaintiff argues that the ALJ erred because there was objective medical evidence in the record to support more than a slight restriction in Plaintiff's daily activities based on a mental impairment.  The court does not consider this to be a challenge to the proper interpretation of Stone v. Heckler, but whether there is substantial evidence in the record supporting the ALJ's determination, and the Appeals Council's concurrence, that Plaintiff had a non-severe mental impairment.

In the present case, Plaintiff applied for disability benefits based on diabetes, peripheral neuropathy, hearing loss, tinnitus, poor eyesight and heart disease.[118]  The medical records submitted in connection with his September 2006 application for disability

---

[118]     Tr. 129.

22

benefits indicated that he was receiving treatment for diabetes and had been tested for peripheral neuropathy and hearing loss.[119] Plaintiff made no mention of any mental impairment in his application for benefits.

In his July 2007 appeal of the initial denial of benefits, Plaintiff complained of worsening tingling and numbness in his extremities, increased difficulty holding objects and increased difficulty walking and standing for long periods.[120]  When asked about new illnesses or conditions, Plaintiff disclosed that he had periodontal disease.[121]  Plaintiff made no mention of any mental impairment or difficulty.

In October 2007, Plaintiff again appealed the denial of disability benefits and described his worsening physical limitations.[122]  He was asked if he had seen a doctor/hospital/clinic or anyone else for emotional or mental problems that limited his ability to work since his last report.[123] Plaintiff responded in the negative.[124]  He also denied any new mental limitations, generally.[125]

---

[119]    Tr. 131-34.

[120]    Tr. 149.

[121]    Id.

[122]    Tr. 158-64.

[123]    Tr. 159.

[124]    Id.

[125]    Id.

Plaintiff's medical records were consistent with his disability paperwork. In medical visits in January 2006,[126] February 2007,[127] and June 2007,[128] Plaintiff was screened for depression and post-traumatic stress disorder with negative results reported. In a February 2008 checkup, Plaintiff disclosed for the first time that he was having "unpleasant dreams" but did not want to share the particulars of the dreams.[129] Based on that disclosure, Plaintiff was referred for a mental health assessment by a social worker.

During the mental health assessment in April 2008, Plaintiff revealed feelings of depression and anger arising from his physical limitations and inability to work.[130] He also stated that he had suicidal thoughts, poor memory and poor concentration.[131] Several weeks later, however, in a June 2008 checkup, Plaintiff reported that his mood was better and a screen for depression was negative.[132]

At the hearing before the ALJ, in August 2008, Plaintiff's attorney argued that the most important and relevant examination

---

[126]   Tr. 220.

[127]   Tr. 231-32.

[128]   Tr. 311, 317.

[129]   Tr. 295.

[130]   Tr. 285-86.

[131]   Id.

[132]   Tr. 283.

was the one performed by Dr. Clanton in September 2006, which documented the severe nature of Plaintiff's diabetes and peripheral neuropathy.[133]  The attorney stated, "I believe the focus of, of our case today, Your Honor, should be on the, the effects of the peripheral neuropathy which seem to be effecting both Mr. Cantu's upper extremities as well as his lower extremities."[134]  Plaintiff's attorney elicited testimony about Plaintiff's work history, his failed attempt to return to work in December 2006, his medical history and his present limitations.[135]  Neither Plaintiff nor his attorney made any mention of any mental limitations.

The ALJ asked follow-up questions about the nature of Plaintiff's day-to-day activities.  Plaintiff explained that he did not attend many social functions outside his home.  He attributed this not to depression or any mental impairment but to an inability to sit for long periods of time and a bladder problem.[136]  Plaintiff admitted being able to drive and walking up to six miles, slowly, at a time.[137]

On redirect examination, Plaintiff's attorney asked Plaintiff if he had any mental impairments such as post-traumatic stress or

---

[133]   Tr. 22.

[134]   Tr. 22-23.

[135]   Tr. 25-38.

[136]   Tr. 40-41.

[137]   Id.

flashbacks.[138]   Plaintiff answered, "I was asked the same thing by social workers and clinical people.  I, I just – I – you know, what I did in the service, I, I just don't want to talk about it.  Well, I guess, I guess some of the stuff I did in the service you know, we'd probably go to jail for here."[139]  Plaintiff also acknowledged that within the past six months, he had noticed that he was having difficulty with short-term memory, explaining that he would forget his car keys or forget to pick up the mail.[140]  Plaintiff admitted that he had not been formally evaluated for any mental impairment.[141]

Based on the above evidence, the ALJ found that Plaintiff did not offer any evidence of a severe mental impairment as that term was defined in Stone v. Heckler.  The ALJ further found that the evidence did not support a finding that Plaintiff had a mental impairment that had "resulted in any significant and ongoing limitation for any continuous twelve-month period, especially given the lack of any evidentiary showing of consistent mental symptoms and/or related treatment."[142]

While the ALJ's use of the terms "significant and ongoing" in

---

[138]    Tr. 42.

[139]    Id.

[140]    Tr. 43.

[141]    Tr. 44.

[142]    Tr. 11.

relation to "limitation" may overreach the Stone v. Heckler holding, the court agrees that there is substantial evidence supporting the ALJ's finding that, as of August 2008, Plaintiff's mental impairment was non-severe as that term is defined in Stone v. Heckler.

The only evidence of any mental impairment in the record before the ALJ was the April 2008 interview with a social worker in which Plaintiff disclosed his anger, fear, and depression over his physical limitations and inability to earn a living. He also revealed that he was angry and depressed about the war in Iraq and was worried about what the servicemen were experiencing there.[143] Plaintiff refused to discuss aspects of his own service in Viet Nam.[144]

Thus, this one episode, followed by other medical evidence showing no symptoms of PTSD or depression, is consistent with Stone's admonition that an impairment can be considered non-severe only if it had a minimal effect on the claimant and would not be expected to interfere with the ability to work. The court has reviewed the entire April 2008 interview and finds that the ALJ's finding that Plaintiff's mental impairment was not severe is consistent with the Stone v. Heckler standard and the disclosures made in that April 2008 assessment.

---

[143]   Tr. 286.

[144]   Id.

27

However, in a case such as this where the final decision of the Commissioner includes the Appeals Council's consideration and rejection of new evidence, the court must consider all evidence when determining whether the Commissioner's decision is supported by substantial evidence.  See Higginbotham v. Barnhart, 405 F.3d 332 (5th Cir. 2005).

In support of his contention that the Commissioner misapplied the Stone v. Heckler severity standard, Plaintiff submitted two January 2009 evaluations further documenting his claim of a mental disability.  The Appeals Council determined that the new evidence did not provide a basis for reversing the ALJ's decision.[145] Plaintiff complains that this new evidence supports his contention that he had a severe mental impairment during the closed period June 10, 2006, through September 9, 2008.

It is well-settled, however, that new evidence must relate to the time period for which disability benefits were denied. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).  The court must consider whether the January 2009 mental evaluations relate to the period between June 10, 2006, and September 9, 2008.

Dr. Pollock, a neuropsychologist, administered a number of tests on January 20, 2009, and found Plaintiff to be suffering from depression and post-traumatic stress disorder.[146] Dr. Pollock found

---

[145]    Tr. 2.

[146]    Tr. 197.

28

Plaintiff to have deficits in motor functioning, visual memory and auditory/language.[147]  Dr. Pollock expressed no opinion when those deficits first became either severe or disabling.

Dr. Ganc administered a number of psychological tests to Plaintiff before determining that he had a major depressive disorder, along with a generalized anxiety disorder and post-traumatic stress disorder.  While those tests provided insights into Plaintiff's current psychological state, Dr. Ganc hypothesized those results retrospectively to opine that Plaintiff had been unable to work since June 2006.  Dr. Ganc's report does not disclose the medical basis for this opinion.  However, in the interview portion of Dr. Ganc's report, Plaintiff explained that he stopped working in 2006 because of numbness in his extremities, his inability to focus, dizziness and a decrease in concentration.[148]

However, the record before the Appeals Council also included the objective medical evidence from Dr. Clanton and clinic visits during the relevant period in which Plaintiff gave no indication of a severe mental impairment, with the exception of Plaintiff's April 2008 visit with the social worker.  Thus, the only evidence in the record before the Appeals Council that supported Plaintiff's contention that he had a severe mental impairment, as opposed to physical limitations, commencing in June 2006 was Plaintiff's self-

---

[147]    Id.

[148]    Tr. 182.

serving statements to Dr. Ganc and Dr. Ganc's opinion that Plaintiff was disabled as of June 2006.

The ALJ has sole responsibility for determining disability status. <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000). Furthermore, SSR 96-5p provides that "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record."

Dr. Ganc's conclusory statements that Plaintiff was disabled and unable to work are determinations that are within the province of the Commissioner and not medical sources. <u>See</u> SSR 96-5p, 1996 SSR LEXIS 2, 14-15. While Dr. Ganc is free to offer his opinion whether Plaintiff is disabled, because physicians often define disability differently than the Act, it is ultimately the Commissioner's responsibility to determine Plaintiff's disability status.

As there was no objective medical evidence supporting Dr. Ganc's conclusion that Plaintiff had been unable to work since June 2006, the Appeals Council was free to reject that opinion of retrospective disability. In light of the objective medical evidence in the record, the Commissioner did not err in determining that Plaintiff's mental impairment was not severe during the period June 1, 2006, through September 9, 2008.

B. **Medical Expert Testimony**

Plaintiff next argues that the ALJ failed to fully and fairly develop the record when he failed to call a medical expert to testify about the combined effect of Plaintiff's impairments. Citing Loza v. Apfel, 219 F.3d 378 (5th Cir. 2000), Plaintiff argues that the ALJ's failure to properly analyze the combined effects of Plaintiff's impairments was reversible error.

In Loza, the ALJ was confronted with evidence of numerous psychiatric and physical limitations over a twenty-year period, from approximate 1973 through 1993. In either 1973 or 1974, Loza was determined to be one hundred percent permanently disabled by the Veterans Administration. Loza, 219 F.3d at 380. However, Loza was only insured through June 30, 1980, for disability benefits. Loza, 219 F.3d at 381.

Despite significant objective medical evidence of disabling headaches, flashbacks, hallucinations, depression and recurrent blackouts that pre-dated April 27, 1979, and post-dated June 30, 1980, the ALJ focused only on the fourteen-month period between those dates to find that Loza's mental impairments were non-severe, and that at most, he was only slightly restricted in his activities of daily living. Loza, 219 F.3d at 392.

In reversing that decision, the Fifth Circuit found that the ALJ had failed to follow the Stone v. Heckler standard for determining whether an impairment was non-severe at step two of the

Bowling analysis.  Loza, 219 F.3d at 393.  The appellate court also found that the ALJ erred by not considering whether the "combined effects of all impairments, mental and physical, would be of sufficient severity" to proceed to step three.  Of concern to the court was that the ALJ did not take into account the fact that Loza had been determined to be one-hundred percent disabled by the Veterans Administration before, during and after the period in issue and had been prescribed antipsychotic drugs and other medicines between 1974 and the date of the hearing.

The court agrees with Plaintiff that, as a general proposition, the ALJ must analyze the "'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'"  Loza, 219 F.3d at 399 (quoting Fraga v. Bowen, 810 F.2d 1296, 1305 (5th Cir. 1987)).  However, the regulations do not require that the ALJ appoint a medical expert and the ALJ's decision not to utilize a medical expert is not error unless "the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby.  Atkins v. Barnhart, 119 Fed. App'x 672, 675 (5th Cir. 2005)(unpublished)(citing Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996)).  "To establish prejudice, a claimant must show that he could and would have adduced evidence that might have altered the result."  Id. (internal quotation marks and citation omitted).

32

Although Plaintiff contends that a medical expert was needed to explain the combined effect of Plaintiff's impairments, Plaintiff points to no evidence that required such medical interpretation.  The ALJ had Dr. Clanton's report which outlined the combined effects of Plaintiff's physical limitations and that report required no additional explanation.  The medical records from the VA clinic were consistent with Dr. Clanton's report.  The ALJ explained the factual basis for his rejection of the Veteran Administration's determinations on disability based on the same medical records.  And, as explained above, the only evidence of a mental impairment presented to the ALJ was the April 2008 interview with a social worker.  This interview, considered in combination with Dr. Clanton's report and other clinic visits, did not require medical expert testimony.

The supplemental submission of the January 2009 psychological evaluations to the Appeals Council did not require medical expert testimony on the combined effect of Plaintiff's impairments because it post-dated the closed period of disability under consideration by the Appeals Council.  Notably, nowhere in either of the January 2009 evaluations is a considered medical opinion that Plaintiff was under a severe mental impairment which commenced in June 2006.  The most Plaintiff can offer is Dr. Ganc's opinion that Plaintiff had been unable to work since he was last employed in June 2006, which, as also explained above, the Appeals Council was free to reject.

Reversal of the ALJ's decision is appropriate only if Plaintiff can show prejudice from the ALJ's failure to request additional evidence. <u>Newton</u>, 209 F.3d at 458. Prejudice can be established by "showing that additional evidence would have been produced if the ALJ had fully developed the record [ ] and that the additional evidence might have led to a different decision." <u>Id.</u> Here, Plaintiff has failed to make any credible argument that additional medical testimony would have changed the decision made in this case.

**C.   Record Development**

Finally, Plaintiff argues that the ALJ erred in failing to properly develop the record when he failed to obtain additional medical testimony to "fully and fairly develop the functional impact of his physical and mental limitations."[149]

A disability claimant has the burden of proving his disability by establishing that he has a severe physical or mental impairment. <u>Cook v. Heckler</u>, 750 F.2d 391, 393 (5th Cir. 1985). However, under some circumstances, a consultative examination is required to develop a full and fair record. See <u>Pearson v. Bowen</u>, 866 F.2d 809, 812 (5th Cir. 1989)(citing 20 C.F.R. § 404.1517 (1986)). The Fifth Circuit has held that a 'full inquiry' does not require a consultative examination at government expense unless the record

---

[149]   Plaintiff's Cross-Motion for Summary Judgment, Docket Entry No. 12, p. 8.

"establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977)(emphasis in original). The ALJ's decision to order a consultative examination is discretionary. Pearson, 866 F.2d at 812.

Furthermore, in order to obtain reversal for an ALJ's failure to fully develop the record, a plaintiff must demonstrate prejudice. Brock v. Chater, 84 F.3d 726, 737 (5th Cir. 1996). Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record and that the additional evidence might have led to a different conclusion. Ripley, 67 F.3d at 557.

Here, Plaintiff argues that prejudice is established based on his January 2009 evaluations which found him to have the severe mental impairments of PTSD, depression, anxiety disorder, and a cognitive disorder.

The question of whether the ALJ fully and fairly developed the record depends on whether there was sufficient evidence in the record for an informed decision. See Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996). As long as sufficient evidence does exist, the ALJ has no duty to request additional evidence. See 20 C.F.R. § 404.1516; Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989).

This court finds that the ALJ did not commit reversible error by failing to order a consultative mental examination. As

discussed above, Plaintiff failed to establish, or even argue, that he had a severe mental impairment in his disability application, in the reconsideration of the application, or before the ALJ. Plaintiff repeatedly denied having symptoms of depression or PTSD when asked by medical practitioners during the two years following his application for benefits with two exceptions - one where he admitted having unpleasant dreams that he refused to discuss and another where he reported feelings of depression and anger concerning his inability to earn a living.  Following that latter incident, Plaintiff denied having any symptoms of a mental impairment.

In addition, there is no medical evidence before the ALJ showing that Plaintiff had any degree of functional impairment due to depression or PTSD during the closed period from June 2006 to September 2008.  The Fifth Circuit has held that isolated comments are insufficient, without further support, to raise a suspicion of a non-exertional impairment.  See Brock, 84 F.3d at 728.  At most, Plaintiff admitted to occasionally forgetting his keys and failing to pay attention to his wife and believed he was losing his ability to concentrate or multi-task.

A psychological consultation was not warranted based on the limited information presented almost as an afterthought at the hearing before the ALJ.

**D. Defendant's Cross-Motion for Summary Judgment**

36

Defendant asserts in his motion that the ALJ's decision and Appeals Council's decision should be affirmed because they properly determined Plaintiff was never under a disability.  Finding no legal error in either decision, the court should not disturb either if substantial record evidence supports the Commissioner's finding that Plaintiff is not disabled.

As the court finds more than a scintilla of evidence in support of the determination, it cannot overturn the decision of the Commissioner, who is given the task of weighing the evidence and deciding disputes.  See Chambliss, 269 F.3d at 522; Carrier, 944 F.2d at 247.

The court also agrees with Defendant that the Commissioner applied proper legal standards in evaluating the evidence and in making his determination.  Therefore, Defendant's cross-motion for summary judgment will be granted.

### IV. Conclusion

For all of the foregoing reasons, Plaintiff's Cross-Motion for Summary Judgment (Docket Entry No. 12) is **DENIED** and Defendant's Cross-Motion for Summary judgment (Docket Entry No. 9) is **GRANTED**.

**SIGNED** at Houston, Texas, this 4th day of November, 2010.

Nancy K. Johnson
United States Magistrate Judge